## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

BENNETT MARINE, INC.,                      CASE NO. 04-60326 CIV MARRA/JOHNSON
a Florida corporation,

        Plaintiff,

vs.

LENCO MARINE, INC., a Florida
corporation, RINKER BOAT COMPANY,
LLC, a Delaware limited liability company,
RICHARD DeVITO, JR., an individual,
and KIM SLOCUM, an individual,

        Defendants.

_____

### BENNETT MARINE'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF DESIGNATED EXPERT WITNESS ROBERT R. McSORLEY ON DAUBERT GROUNDS AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

Plaintiff/Counter Defendant, Bennett Marine, Inc. ("Plaintiff"), pursuant to Federal Rules of Evidence 701 and 702 through 704, respectfully moves this Court to limit, suppress, or otherwise preclude Defendants, Lenco Marine, Inc., Rinker Boat Company, LLC, Richard DeVito, Jr., and Kim Slocum (collectively "Defendants") from offering the testimony of expert, Robert R. McSorley and to strike the Expert Report and Disclosure of Robert R. McSorley of May 28, 2008, and in support files this motion and incorporated memorandum and states the following.

### STATEMENT OF FACTS

With respect to its defense of the breach of contract, patent infringement and unfair competition claims, Defendants have proffered Robert R. McSorley as an expert to opine on (1) the appropriate measure and amount of damages sustained by Plaintiff as a result of the alleged infringement of U.S. Patent No. 5,113,780 (the "'780 Patent") by Defendants, and (2) determine

the reasonable royalty rate.  Mr. McSorley has authored a report that encompasses what Plaintiff believes are his expert opinions in this matter. (See Expert Report and Disclosure of Robert R. McSorley of May 28, 2008 ("Expert Report")).  As detailed below, Mr. McSorley is not qualified to render the opinion or legal conclusions that he has presented and his opinion is purely speculative and pure conjecture unsupported by any verifiable methodology.  For these reasons, the Court should strike the Expert Report of Robert R. McSorley and preclude his testimony at trial.

**ARGUMENT**

To be admissible, expert testimony must, *inter alia,* "assist the trier of tact to understand the evidence or to determine a fact in issue."  *See* Fed. R. Evid. 702; *accord United States v. Smith*, 122 F.3d 1355, 1358 (11th Cir. 1997)("Expert testimony that does not assist the trier of fact can be excluded....").  Thus, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004)(en banc)(citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)).  By contrast, expert testimony is "properly excluded when it is not needed to clarify facts and issues of common understanding which [the trier of fact is] able to comprehend." *Hibiscus Associates Ltd. V. Bd. Of Trustees of Policemen and Firemen Retirement Sys. Of City of Detroit,* 50 F.3d 908, 917 (11th Cir. 1995).  "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63 (citing 4 *Weinstein's Federal Evidence* § 702.03[2][a]).

Expert testimony must not only assist the trier of fact, it must be reliable. *See* Fed. R. Evid. 702. District courts "have substantial discretion in deciding how to test an expert's reliability. *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1292 (11th Cir. 2005)(quoting *United States*

*v. Majors,* 196 F.3d 1206, 1215 (11th Cir.1999)).  "*Daubert* instructs courts to consider the following factors: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey,* 298 F.3d at 1256 (citing *Daubert*, 509 U.S. at 593-94).  This test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999).  Under this standard, a trial court is required "to conduct an exacting analysis of the proffered expert's methodology." *McCorvey,* 298 F.3d at 1257.

This Court has recently excluded expert testimony for its failure to assist the trier of fact. In *Martinez v. Rabbit Tanaka Corp. Ltd.,* No 04-61504-CIV-ALTONAGA, 2006 WL 5100536 (S.D. Fla. Jan. 6, 2006), the plaintiffs alleged that the defendants tortuously interfered with a business relationship by improperly utilizing holographic products designed by the plaintiffs. In granting summary judgment for the defendants, the Court disregarded expert reports submitted by the plaintiffs to establish damages.  The initial report, the Court explained, relied "on no discernible methodology" that were not "'testable' or independently verifiable" and were "unsupported by market data or research." *Id.*  Noting that the significance of an opinion is "proportioned to the sources that sustain it," *id.* at *14 (quoting *Petrogradsky Mejdunarodny Kommerchesky Bank v. National City Bank,* 170 N.E. 479, 483 (N.Y. 1930)(Cardozo, J.)), the Court concluded that the expert's "ultimate opinion on damages amounts to nothing more than his own *ipse dixit*," *id.* at *14.  The Court also concluded that the proffered testimony did not assist the trier of fact because it advanced opinions that did not require the application of expertise. *Id.* at *15.  The "opportunity for vigorous cross examination and the presentation of

contrary evidence alone provide no basis for admitting expert testimony which falls well below the standard for expert testimony envisioned under the Federal Rules of Evidence." *Id.*

Robert R. McSorley's opinions present the same deficiencies. They do not assist the trier of fact's evaluation of the evidence. McSorley's opinions, moreover, reflect his own uncorroborated reasoning and are unsupported by any testable or verifiable methodology. Because the opinions of Robert R. McSorley fall "well below the standard for expert testimony envisioned" by the federal rules, the testimony of Robert R. McSorley should be precluded at trial.

## I.    Legal Standards Governing Admission of Expert Testimony

Rules 702 through 704 of the Federal Rules of Evidence govern the admissibility of expert testimony, subject to the relevancy provisions of Rules 401 through 403. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The rule was amended in 2000 in response to Daubert v. Merrell Dow Pharms., Inc., 579 (1993), and to the many cases applying Daubert, including Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) and General Elec. Co. v. Joiner, 522 U.S. 136. 140 (1997). More recently, in Schneider v. Fried, 320 F.3d 396, 405 (3d Cir.2003), the Third Circuit described these requirements as the "trilogy of restrictions on expert testimony: qualification, reliability and fit."

As is well known, in Daubert the Supreme Court directed district courts to perform a

screening, or "gatekeeping" function to insure that evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence.  Daubert, 509 U.S. at 589, 597.  In Kumho Tire, the Supreme Court reiterated this role and clarified that the gatekeeper function applies to all expert testimony, not only scientific testimony.  Kumho Tire, 526 U.S. at 151.

   To satisfy the demands made by Rule 702 and Daubert, the trial court must first determine that the expert opinion **is reliable** and "more than subjective belief or unsupported speculation." 509 U.S. at 590.  The expert testimony must "[rest] on a reliable foundation and is relevant to the task at hand.  The focus…must be solely on the principles and methodology, not on the conclusion that they generate." Santoro v. Donnelly 340 F. Supp. 2d at 464, 472 (S.D.N.Y. 204) (*quoting* Daubert, 509 U.S. at 597).   Reliability of expert testimony can be determined by four criteria established in Daubert including: (1) whether the theory or technique can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) "general acceptance" within the relevant scientific community. Id. (*See* 509 U.S. at 593-94).  These factors do not exclusively apply to scientific knowledge, but extend to knowledge in other specified fields. Id. (*quoting* Kuhmo Tire, 526 U.S. at 150).   The trial court **must exclude** expert testimony "if it is s**peculative or conjectural**, or if it is based on assumptions that are so unrealistic and uncontradictory as to suggest bad faith." Boucher v. U.S. Suzuki Motor Corp., 73 F.3rd 18, 21 (2d Cir. 1996) (emphasis added).

   Under Daubert, the trial court must secondly determine whether the expert testimony offered **is relevant** and "will assist the trier of fact to understand the evidence or to determine a

fact in issue." Fed. R. Evid. 702.  The testimony should not be admitted if the trier of fact, with a lay person's knowledge, can make determinations about evidence without the need for explanation and assistance from an expert.  Mowry v. Viacom Int'l Inc., No. 03 Civ. 3090, 2005 WL 1793773 (S.D.N.Y. July 29, 2005).

## II.      **Threshold Question of Qualification**

Central to the question of admissibility, an expert witness must be qualified to testify to the opinions he intends to express.  Fed. R. Evid. 702; Kumho Tire, 526 U.S. at 156.  In Elcock v. Kmart Corp., 233 F.3d 734 (3d Cir. 2000), the Third Circuit reaffirmed the standard for qualifying an expert:

> Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony.  The basis of this specialized knowledge "can be practical experience as well as academic training and credentials."  We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts."

Id. at 74

 (internal citations omitted).  An expert may be excluded when his training and experience is lacking in the particular area in which his testimony is offered.  For example, in Estate of Lam v. Upjohn Co., No. Civ.A.94-033-H, 1995 WL 478844, at *2 (W.D. Va. Apr. 21, 1995) the court excluded expert testimony on pharmaceutical warnings when the expert had "no academic training or regulatory experience and ha[d] never participated in any FDA-related proceedings addressing what constitutes an adequate warning."  Thus, "a party cannot qualify an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." In re Diet Drugs Prod. Litig., No. MDL 1203, 2000 WL 962545, at *3 (E.D. Pa. June 28, 2000).

III.   **Mr. McSorley is Not Qualified to Opine on the Amount of Damages and His Testimony is Based on Insufficient Data and Erroneous Methods**

      A.      **Erroneous Royalty Rate**

Mr. McSorley has concluded that the reasonable royalty rate in this case was $3 per Lenco trim tab switch that was found to infringe on the '780 Patent. (Depo. p.22:9-12). Accordingly, Mr. McSorley uses the cost to Lenco to reconfigure the design of the product by adding a non-ignition switch, which costs approximately $3, which he considers the next best alternative, in determining the reasonable royalty rate. (Depo. p.31:22-23).   However, Mr. McSorley admits that he is not sure what Lenco sells the switch for (Depo. p. 32:3-4), and did not get any supporting records for the actual cost to Lenco of the switch or know whether Lenco actually sold the switch independent of their trim tabs (Depo. p. 32:7-12).

Moreover, Mr. McSorley did not reach any conclusions as to how many infringing product Lenco sold (Depo. p. 35:19-22) because the information was not in the records made available to him (Depo. p. 35:23-36:4). Mr. McSorley never requested additional documents that would permit him to do a more thorough analysis (Depo. p. 36:13-16).   Mr. McSorley was unable to quantify the amount of damages in this case.   While at the time of his engagement it was his objective to reach a conclusion as to the number of infringing products produced by Lenco inclusive of developing an opinion on the royalty rate and lining it so to a royalty base, he independently determined that his best approach was to determine the royalty rate and leave the royalty base to another day. (Depo. p. 37:3-38:10).   While Mr. McSorley attributes his inability to quantify the amount of damages in this case to the fact that at the time he submitted his report Lenco sales of their switches had not been produced, (Depo. p. 39:14-22) Mr. McSorley did not ask for any information in order to be able to quantify damages (Depo. p. 40:7-14) nor did he ask for financial statements (Depo. p. 41:13-16).

The conjecture which forms the backbone of Mr. McSorley's reasonable royalty is highlighted by the following questions and answers:

> Q:    In this case when you went to Royalty Source and asked for information, you wanted to identify the industry of the patented suit, you said the marines?

> A:    That's one.

> Q:    Royalty Source sent you back some information, right?

> A:    Yes.

> Q:    The information had to do with describing the royalties of patents that had been licensed in the marine industry?

> A:    Yes.

> Q:    The vast majority of those patents had as a royalty base a percentage of sales, right?

> A:    Yes.

> Q:    But that's not what you did in reaching your conclusion?

> A:    No. In my opinion in this case I went with a dollar per unit given that there are issues concerning which of these switches infringe.

> I have no opinion on that whatsoever. Whether or not the 123 infringes, or the 124, or whatever.

> I considered those rates. At the end of the day I concluded the royalty rate should be presented as a dollar per unit as opposed to a percentage of revenue.

(Depo. pp. 54:14-55:16)

The guesswork and imprecise nature of Mr. McSorley's calculation is reflected in the following questions and answers:

> Q:    You testified earlier, correct me, that with regard to

the 124 switch Lenco sells at $17, 124R sells between $19 and $27 with a margin of 50 percent, is that correct?

A:    Yes.

Q:    Where did you get that information?

A:    Well I originally got it from Mr. DeVito and Mr. Lexter.   Then I was provided with invoices, Lenco invoices that supported those price points.

Again, what I'm saying here is I evaluated the difference in the price points between the 124 and 124R to assess the value attributable to the automatic retraction feature.   I didn't consider the entire profitability of the 124R to form my opinion in this case.

Q:    What verification or support where you given for the profit margin?

A:    I don't believe I received any support for that other than what I read in some depositions…For some reason when I heard 50 percent from Mr. DeVito, I thought that that was a number that sounded reasonable.

Q:    But he never offered any documentary support for it, and you never asked?

A:    No.

(Depo. pp. 42:3-43:20).

It is respectfully submitted that Mr. McSorley's approach to determining the reasonable royalty rate is replete with conjecture.   None of the <u>Daubert</u> criteria are satisfied by Mr. McSorley's loose methodology.

**C.    Mr. McSorley's Opinion is Not Reliable and His Royalty Rate is Unfounded**

Absent any legitimate basis and without considering that in a two-supplier market[1] the sale by one company may preclude the sale by the other company (Depo. p. 71:12-16) and that the trim tab systems sell for hundreds of dollars per unit (Depo. p. 71:9-11), Mr. McSorley,

---

[1] McSorley admits that the market for trim tabs is essentially a two-supplier market between Bennett and Lenco (Depo. p. 66:16-17)

based upon no verifiable criteria or standards opines that a $3 royalty rate is a reasonable royalty rate and that the rate should be based on the cost to Lenco of a non-engine switch instead of on a percentage of lost revenues.

Common sense would dictate that, with trim tabs that sell for hundreds of dollars and where there is an obvious benefit by virtue of the automatic retraction feature, under no circumstances would Bennett forego a sale by licensing its patented technology to its competitor for $3.

The absence of any legitimate basis for not basing his royalty of a percentage of revenue is reflected in the following questions and answers:

> Q:      Prior to this case have you ever sought to apply the Georgia Pacific factors to a two-competitor market?
>
> A:      I have been involved in dozens of cases going back to 1992.  I'm sure I have.
>
> I gave the Rite Height v. Kelly that was basically a two-supplier market.
>
> Q:      The conclusion reached there by your team was that the royalty would be based on a percentage of revenues, right?
> A:      Yes. Percentage of revenues on the accused products.
>
> Q:      In the Royalty Source information that you received the most common royalty base was a percentage of revenue, is that correct?
>
> A:      The most common royalty rate is percentage of revenues.
>
> Q:      Even if the licensed technology was a component to be incorporated into a completed product?
>
> A:      Generally, yes.

(Depo. pp. 74:17-75:16).

### D.   Unsubstantiated Royalty Rate

Mr. McSorley does not explain whatsoever why, given his understanding of a two-supplier market and his understanding about the margins in the marine industry, instead of basing the royalty on a percentage of revenues on the accused product, he concludes that a $3 cost of the non-engine switch is a fair and reasonable royalty that Bennett would agree to accept from Lenco.

Mr. McSorley has managed to provide this royalty rate without any direct support for his finding.

### E.   Baseless Assumptions Concerning

According to Mr. McSorley, the $3 royalty rate reflects the value of the patent because the scope of the patent, based on his interpretation of the patent and the allegations and the settlement agreement, is that the technology disclosed to the patent can be worked around by the installation of another switch. (Depo. pp. 85:21-86:3).  Mr. McSorley did not provide the requisite evidence or reasoning for such a conclusion.

## IV.   Unreliable Testimony Should be Excluded

The essential lesson learned from Daubert, Kumho Tire and Joiner is that an expert's testimony must be based upon sufficient facts and flow from the reliable application of sound reasoning or methods. Fed.R. Evid. 702. "An expert's opinion is reliable if it is 'based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation"; the expert must have "good grounds" for his or her belief.'"Elcock, 233 F.3d at 745.

The non-exclusive checklist of factors set forth by Daubert and its progeny for courts to use in assessing whether a particular scientific methodology is reliable, and thereby admissible,

include: (a) whether a "theory or technique…can be (and has been) tested"; (b) whether it "has been subjected to peer review and publication"; (c) whether, in respect to a particular technique, there is a high "known potential rate of error" and whether there are "standards" controlling the application of the technique; and (d) whether the theory or technique enjoys "general acceptance" within" a "relevant scientific community." <u>Kumho Tire</u>, 526 U.S. at 149 (citing <u>Daubert</u>, 509 U.S. at 592-94).

Although an overused phrase, it is applicable to the testimony challenged here: "[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Joiner</u>, 522 U.S. at 146.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendant respectfully requests that the Court grant the instant motion striking the Expert Report of Robert R. McSorley and preclude his testimony at trial.

Dated: January 13, 2009

s/ Dania Saavedra
James M. Kaplan
Florida Bar No. 921040
E-mail:  james.kaplan@kaplanzeeman.com
Dania Saavedra
Florida Bar No. 28375
E-mail:  dania.saavedra@kaplanzeena.com
**Kaplan Zeena LLP**
2 South Biscayne Blvd., Suite 3050
Miami, Florida 33131
Telephone:  (305) 530-0800
Facsimile: (305) 530-0801
*Co-Counsel for Bennett Marine, Inc.*

and

s/ Christina DeAngelis
James A. Gale
Florida Bar No. 371726
E-Mail: jgale@feldmangale.com
Gregory L. Hillyer
Florida Bar No. 682489
E-mail: ghillyer@feldmangale.com
Christina D. DeAngelis
Florida Bar No. 664456
E-Mail: cdeangelis@feldmangale.com
**Feldman Gale**
2 South Biscayne Blvd., 30th Floor
Miami, Florida 33131
Telephone:  (305) 358-5001
Facsimile: (305) 358-3309
*Co-Counsel for Bennett Marine, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Dania Saavedra

13